**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK** 07 CV 1777

ARNOLD GILES, Individually and On )
Behalf of All Others Similarly Situated, )
　　　　　　　　　　　　　　　　　　 )
　　　　　　　Plaintiff, )
　　　　　　　　　　　　　　　　　　 )
　　　vs. )
　　　　　　　　　　　　　　　　　　 )
NUVELO, INC., TED W. LOVE, GARY )
S. TITUS and SHELLY D. GUYER )
　　　　　　　　　　　　　　　　　　 )
　　　　　　　Defendants. )
　　　　　　　　　　　　　　　　　　 )

CIVIL ACTION NO.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
MAR 0 1 2007
U.S.D.C. S.D. N.Y.
CASHIERS

　　　　Plaintiff, Arnold Giles ("Plaintiff"), alleges the following based upon the investigation

by Plaintiff's counsel, which included, among other things, a review of the Defendants' public

documents, conference calls and announcements made by Defendants, United States Securities

and Exchange Commission ("SEC") filings, wire and press releases published by and regarding

Nuvelo, Inc. ("Nuvelo" or the "Company"), securities analysts' reports and advisories about the

Company, and information readily available on the Internet, and Plaintiff believes that

substantial additional evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

　　　　1.　　　This is a federal class action on behalf of purchasers of the publicly traded

securities of Nuvelo between January 5, 2006 and December 8, 2006, inclusive (the "Class

Period"), including purchasers in Nuvelo's January 30, 2006 $119 million follow-on offering

("Follow-On Offering"), seeking to pursue remedies under the Securities Exchange Act of 1934

(the "Exchange Act").

1

2.      Nuvelo is a biopharmaceutical company that engages in the discovery, development, and commercialization of various treatment drugs, including alfimeprase, a thrombolytic agent with a novel mechanism of action. Prior to and during the Class Period, the Company pursued alfimeprase for its use in catheter occlusion, acute peripheral arterial occlusion ("PAO") and other medical conditions.

3.      The complaint alleges that, throughout the Class Period, Defendants failed to disclose or indicate: (1) that the clinical trial information regarding multiple alfimeprase studies was inaccurate; (2) specifically, clinical data from testing failed to show that alfimeprase, when administered through a catheter, could dissolve blood clots; (3) that no reliable data existed to show that alfimeprase would meet the high standards for efficacy for FDA approval; (4) that such information, as described above, was known to Defendants as early as December 2004, when Amgen discontinued its investment in alfimeprase; and (5) that, as a result of the above, the Company's statements concerning alfimeprase and its clinical trials were lacking in any reasonable basis when made.

4.      On December 11, 2006, Nuvelo shocked investors when it revealed that, contrary to earlier positive reports provided by the Defendants, Nuvelo's clinical trials of alfimeprase did not meet any of the primary or key secondary endpoints established for success. In addition, the Company announced that it had temporarily suspended enrollment in all other ongoing trials, pending discussions with outside experts and regulatory agencies due to safety concerns and the usefulness of alfimeprase.

5.      On this shocking and unexpected news, shares of Nuvelo plummeted $15.50, or 79 percent, to close, on December 11, 2006, at $4.05 per share, on unusually high trading volume.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

8.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). JP Morgan, Deusche Bank Securities, Inc. and Lehman Bros. are all headquartered in New York City, and the investment banking and post-offering market-making activities in connection with the Follow-On Offering all took place in this District.

9.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Nuvelo securities at artificially inflated prices during the Class Period and has been damaged thereby.

11.     Defendant Nuvelo is a Delaware corporation with its principal place of business located at 201 Industrial Road, Suite 310, San Carlos, California.

12.     Defendant Ted W. Love ("Love") was, at all relevant times, the Company's President and Chief Executive Officer ("CEO") and Chairman of the Board.

3

13.     Defendant Gary S. Titus ("Titus") was, at relevant times, the Company's Chief Accounting Officer ("CAO") and Vice President of Finance.

14.     Defendant Shelly D. Guyer ("Guyer") was, at relevant times, the Company's Vice President of Business Development and Investor Relations.

15.     Defendants Love, Titus, and Guyer are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Nuvelo's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

16.     Nuvelo is a biopharmaceutical company that engages in the discovery, development, and commercialization of various treatment drugs, including alfimeprase, a thrombolytic agent with a novel mechanism of action.

17.     Prior to and during the Class Period, the Company was pursuing alfimeprase for

4

its use in catheter occlusion, acute PAO and other medical conditions. The Company described alfimeprase as:

> [A]n enzyme produced by recombinant DNA technology that rapidly dissolves blood clots through a unique mechanism of action; it directly degrades fibrin, a protein that provides the scaffolding for blood clots. **In clinical studies to date, alfimeprase has been shown to have the ability to degrade peripheral arterial (e.g. leg) clots within four hours of initiation of dosing and to clear occluded catheters in 15 minutes or less.** In addition, its lytic activity is localized to the site of delivery due to its rapid inhibition by alpha-2 macroglobulin, a naturally occurring protein in the blood, as soon as it moves away from the clot and into the general circulation. This clearance mechanism helps focus the thrombolytic activity to the site of delivery and, in clinical testing, appears to minimize bleeding side effects. [Emphasis added.]

18.     Alfimeprase was originally researched and developed by Amgen, although they abandoned commercialization of the drug after they were unable to identify any positive results following testing. Following Amgen's disappointing results with alfimeprase, Nuvelo sought to assume the future development of alfimeprase, with the possibility of commercialization upon achieving marketable clinical results. In order to capitalize on this opportunity, Nuvelo needed to achieve two prerequisites - it needed to achieve marketable results from clinical testing of the drug, and it needed to obtain sufficient funding to back its pitiable business operations.

19.     To achieve the first objective, prior to and during the Class Period, Nuvelo continually stressed that identifiable benefits of alfimeprase were realized during early clinical trials of the drug. Statements by the Company touted alfimeprase as a highly beneficial future treatment option for patients suffering from catheter occlusion, peripheral arterial occlusion (PAO), and other medical conditions. For example, on December 14, 2005, Nuvelo issued a statement entitled "Nuvelo Receives Special Protocol Assessment for Phase

3 Trial of Alfimeprase in Acute Peripheral Arterial Occlusion." Therein, the Company, in relevant part, stated:

> **Previously announced results from the NAPA-1 trial, a Phase 2 multi-center, multi-national, open-label, dose-escalation study, demonstrated that alfimeprase can restore arterial blood flow within four hours of initiation of dosing, has a favorable safety profile with minimal bleeding complications and resulted in a minority of patients requiring open vascular surgery within 30 days of treatment.**
>
> "We believe that patients with acute PAO would benefit from a new and improved therapy as current treatments such as open vascular surgery and off-label use of plasminogen activators can be time-consuming and can cause significant side effects, particularly bleeding," said Steven R. Deitcher, M.D., vice president of medical affairs for Nuvelo. **"In clinical trials conducted to date, alfimeprase has shown promise as an easily administered, rapid-acting clot dissolver with a favorable safety profile."** [Emphasis added.]

20.     Based on such representation by the Company, it seemed that Nuvelo was somehow able to achieve the beneficial results that had escaped Amgen. Despite this apparent success with the drug, the Company continued to suffer from the lack of capital funding necessary to support a wide scale testing of alfimeprase. Not to be deterred, Nuvelo solicited several potential investors to enter into a partnership to develop and eventually commercialize alfimeprase. Eventually Nuvelo found a partner in Bayer Healthcare AG ("Bayer"), and negotiated an immediate capital infusion, as well as significant additional cash payments from Bayer upon the achievement of identifiable milestones in the testing of alfimeprase. Bayer provided these payments and incentives to Nuvelo in exchange for the exclusive right to market the drug outside of the United States.

21.     On the surface, such a contingent structured deal seemed optimal for all parties involved in the transaction. However, Bayer neglected to require Nuvelo to demonstrate efficacy

initially, merely trusting Nuvelo to simply report such achievements. In conformity with the enticement laden understanding with Bayer, Nuvelo reported positive results from multiple rounds of clinical trials of alfimeprase. What Nuvelo failed to tell its partner and the public was they were not accurately reporting the data that was gleaned from these clinical trials. Adding insult to injury, and contrary to statements made prior to and throughout the Class Period, it was eventually revealed that alfimeprase was not able to achieve any of the primary or secondary endpoints that it sought to achieve through the clinical trials.

## Materially False and Misleading
## Statements Issued During the Class Period

22.     The Class Period commences on January 5, 2006. On this day, Nuvelo issued a press release entitled "Nuvelo and Bayer Healthcare Enter Comprehensive Collaboration Agreement to Maximize Global Development and Commercialization of Alfimeprase." Therein, the Company, in relevant part, stated:

> **Bayer HealthCare to Commercialize in All Territories Outside of the U.S., Nuvelo Retains Full U.S. Commercialization Rights and Will Receive Rest of World Royalties, Milestone Payments Totaling $385M and Development Funding**
>
> Partners to Expand Beyond Current Phase 3 Programs to Develop Alfimeprase for Stroke and Deep Vein Thrombosis
>
> * * *
>
> Nuvelo Inc. (Nasdaq: NUVO) today announced that it has entered into a collaboration agreement with Bayer HealthCare AG (BHC) **to maximize the global development and commercialization of alfimeprase, Nuvelo's lead Phase 3 product candidate. Alfimeprase, a novel, first-in-class thrombolytic or blood clot dissolver that directly degrades fibrin, has been shown in clinical studies to provide rapid clot dissolution with a well tolerated safety profile.**
>
> **Under the terms of the agreement, Nuvelo will retain all commercialization rights and profits from alfimeprase sales in the United States. BHC will commercialize alfimeprase in all territories outside the U.S. and will pay Nuvelo tiered royalties**

7

**ranging up to 37.5% that reflect the late-stage development status and significant market potential of alfimeprase.**

**Nuvelo is eligible to receive up to $385 million in milestone payments including a $50 million up-front cash payment, up to $165 million in development milestones and $170 million in sales and commercialization milestones over the course of the agreement.** In addition, BHC will be responsible for 40 percent of the costs for global development programs. Nuvelo will be responsible for 60 percent of the costs and will remain the lead for the design and conduct of the global development programs. **In 2006, Nuvelo expects to receive payments totaling $90 million, including the $50 million up-front payment and an additional $40 million in shared development expenses and a milestone payment for initiating a Phase 2 proof-of-concept trial in stroke.**

"In 2005 we articulated our strategy to pursue a partnership for alfimeprase that would maximize its commercial potential and allow us to accelerate commercialization outside of the U.S. while establishing our own domestic sales force.  As part of this strategy, we implemented a rigorous process that garnered substantial interest from multiple potential partners and ultimately enabled us to identify an ideal partner who shared our vision for alfimeprase," said Ted W. Love, M.D., chairman and chief executive officer of Nuvelo. "Bayer HealthCare proved to be the optimal partner based on its cardiovascular development and commercialization expertise, global reach and ability to provide significant resources to rapidly develop alfimeprase's full commercial potential."

"This Phase 3 compound has the potential to be a significant addition to our cardiology/hematology business," said Wolfgang Plischke, president of Bayer HealthCare's Pharmaceutical Division. "Thrombosis-related diseases are highly prevalent, and alfimeprase's ability to rapidly dissolve clots in clinical trials conducted to date suggest it may be the ideal complement to our range of products that address coagulation and thrombosis. We believe alfimeprase has the potential to transform the treatment of patients suffering from thrombotic-related disorders."

Nuvelo and BHC will jointly engage in a comprehensive global development plan to maximize the clinical and commercial potential of alfimeprase in the U.S. and abroad, as well as establish a worldwide franchise that addresses the unmet medical need of the large number of patients with diseases caused by blood clot

8

formation. **Alfimeprase is currently being studied in Phase 3 clinical trials for the potential treatment of acute peripheral arterial occlusion (PAO) and catheter occlusion (CO), and may have utility in a wide range of additional thrombotic-related conditions such as stroke, deep venous thrombosis (DVT) and myocardial infarction.** These disorders are among the most common causes of death and morbidity in the Western world. The companies plan to expand beyond the current Phase 3 programs and initiate additional clinical programs with alfimeprase in stroke and DVT. A Phase 2 program in stroke is expected to begin in the second half of 2006 and a Phase 2 program in DVT is expected to begin in 2007. [Emphasis added.]

23.    On January 5, 2006, Defendants held a conference call to discuss the recent developments with regard to alfimeprase. During the call, Defendant Love stated:

DR. TED LOVE, CHAIRMAN, CEO, NUVELO, INC.: Thank you all for joining us this morning. This is an exciting day for Nuvelo, and one we've been working diligently towards for over a year. We are very pleased to announce that we have entered into a comprehensive global collaboration agreement with Bayer HealthCare AG to maximize global development and commercialization of Alfimeprase.

**Alfimeprase is a novel first-in-class direct acting thrombolytic or blood clot dissolver that has been shown in clinical studies to provide rapid clot dissolution with a well tolerated safety profile. Bayer shares our vision now Alfimeprase has potential to change the treatment paradigm for the more than 10 million patients in the Western world who suffer from blood clot related or thrombotic conditions each year.**

As many of you know, in 2005 we articulated a strategy to pursue a partnership for Alfimeprase that would optimize its worldwide commercial potential and allow us to accelerate commercialization outside the United States while retaining rights within the United States. Specifically we plan to market Alfimeprase in the U.S. ourselves and establish a partnership with a top tier cardiovascular company to commercialize Alfimeprase outside the United States.

As part of this strategy we implemented a rigorous process that garnered substantial interest from multiple potential partners. Our collaboration with Bayer delivers exactly what we set out to

9

accomplish. It enables Nuvelo to retain sole commercial rights for Alfimeprase in the United States while engaging a world-class partner who can best deliver Alfimeprase to patients in all territories outside the United States. Bayer proved to be the ideal partner from many perspectives, including its cardiovascular development and commercialization expertise, global reach and ability to provide significant resources to rapidly develop Alfimeprase's full commercial potential. **In Bayer we have a partner who shares our vision for Alfimeprase and to seize its potential to transform the treatment of patients suffering from thrombotic-related disorders based on its demonstrated safety profile, ease of administration and ability to rapidly dissolve clots.**

Bayer has a strong global cardiology and hematology franchise, and is committed to bringing novel therapies for thrombotic diseases to market with late stage programs in venous, thromboembolism, and the prevention of stroke in atrial fibrillation. Nuvelo and Bayer **will** jointly engage in a comprehensive global development program to maximize the clinical and commercial potential of Alfimeprase. **Alfimeprase is currently in Phase III clinical trials for acute peripheral arterial occlusion or PAO, and catheter occlusion and may have utility in a wide range of additional thrombotic-related conditions, such as stroke, deep venous thrombosis and acute myocardial infarction. These disorders are among the most common causes of death and morbidity in the Western world.**

**In collaboration with Bayer we plan to expand beyond the current Phase III programs and initiate clinical programs with Alfimeprase in stroke and DVT. Specifically we plan to initiate a Phase II trial in stroke in the second half of 2006 and a Phase II trial in DVT sometime in 2007.**

**Alfimeprase is an enzyme produced by recombinant DNA technology that rapidly dissolves blood clots through a unique mechanism of action by directly degrading fibrin, a protein that provides the scaffolding for blood clots. In clinical studies to date Alfimeprase has been shown to have the potential to degrade clots within the arteries of the leg within four hours of initiation of dosing and to clear occluded catheters in 15 minutes or less.**

In addition its thrombolytic activity is localized to the site of delivery due to its rapid inactivation by alpha-2 macroglobulin, a naturally occurring protein in the blood. In clinical testing this clearance mechanism appears to minimize bleeding side effects.

10

Due to its unique clinical profile Alfimeprase has potential to establish a worldwide franchise that addresses the unmet medical need of the large number of patients with diseases caused by blood clot formation.

We initiated a development strategy and acute PAO in catheter occlusion to enable rapid market entry. Now with these clinical trials well underway we plan to initiate clinical programs to look at other strategic indications, including stroke and deep vein thrombosis which represent significantly larger market opportunities.

Our partnership with Bayer brings significant financial and human resources to the expanded development and commercial launch of Alfimeprase. This resource commitment demonstrates Bayer's confidence not only in the initial indications currently being pursued, but also in label expansion and the global market potential of additional indications. The depth of commercial experience and capability at Bayer positions us well to achieve our aggressive launch plans for Alfimeprase in multiple indications on a global scale.

\* \* \*

2006 promises to be a transformational year for Nuvelo. We look forward to collaborating with Bayer to progress the Alfimeprase development programs. We will move forward with Alfimeprase in additional indications in stroke and DVT and plan to event all the programs in both our cardiovascular and oncology pipeline through 2006. Today's agreement with Bayer represents a major milestone. And it brings us closer to our goal of improving the lives of patients through the discovery, development and commercialization of novel drugs for acute cardiovascular and cancer therapy.

\* \* \*

MARK MONANE, ANALYST, NEEDHAM & COMPANY: ... Two questions please. One is which part of the Alfimeprase story was most attractive to the buyer? Was it the current Phase III trials underway, or was it really the promise of the future of going where class R like PE in stroke and MI?

DR. TED LOVE: Well, I think everyone that came in the door quite frankly was consistently impressed with the data that we generated with Alfimeprase, suggesting a dramatic feat of action

11

and also its safety profile which emanates from the inactivation by alpha-2 macroglobulin. And it is really that profile and the confidence that that profile will be demonstrated in Phase III that generated excitement at Bayer and generated excitement quite frankly in every organization that we spoke with. So I think people really do see this as a transformational therapy, much like serotonin reuptake inhibitors were in Depression or the HMG-CoA reductase inhibitors were in the treatment of hyperlipidemia. So I think it really is looking forward recognizing that there are a great deal of thromboembolic disease out there, probably 10 million patients worldwide that really are not being well served with current therapies and Alfimeprase could deliver that unmet medical need.

MARK MONANE: That was helpful. One more question. Such a nice deal of course depends on the progress of the current Phase III trials. Could you -- would you be kind enough to update us on the current status of enrollment and how are the four Phase III trials moving along at this point?

DR. TED LOVE: What I will say to that is that obviously all the discussion that we had with potential partners was fully transparent about the conduct of the current trials. And I can tell you that all those efforts have been going extremely well. And very consistent with the promises that we've made to you and everyone. We will be giving you some updates on enrollment projections very soon.

* * *

CORY KASIMOV, ANALYST, OPPENHEIMER & CO:... You have long talked about the potential market opportunity for Alfimeprase and the number you've consistently thrown out there is greater than $500 million in worldwide market potential. How does that change now with the confirmation that you will indeed be taking Alfimeprase into the clinic to evaluate it against both stroke and DVT?

DR. TED LOVE: The number certainly goes up quite dramatically. The $500 million number that you reference is in fact an accurate number. We built that number off looking at two indications. And with the two indications that we had under study, that is acute PAO and catheter occlusion. It has been very clear to us from the very beginning that stroke and DVT are much larger market opportunities. But we did not start with those indications because of the development strategy was

12

really focused on going after indications which will be rapid to market, which would demonstrate the superior advantage of the compound in terms of **its** fast speed of action and would provide a low-risk regulatory path for approval. **Now that we've got those programs obviously well underway, we plan to turn our attention to DVT, stroke, other indications to really exploit the full commercial potential and the full medical benefit of the product.**

\* \* \*

LAUREN RICK, ANALYST, GOLDMAN SACHS: Just have a quick question, it's probably still early days but could you give us an idea of what you expect treatment timing to be for Alfimeprase in stroke, please?

DR. TED LOVE: It is a little early, but I think I could go back to a couple of reference points to give you some perspective. Obviously the time out for tPA is up to three hours. But as you probably know I was at Genentech when we did the filing for tPA with stroke. And it actually if you look at the data carefully, there is some evidence that tPA is active out as long as six hours. What happens, though, with plasminogen activators is that as time goes forward the risk of a hemorrhagic conversion increases with those drugs? **We think that Alfimeprase not having the systemic activity that we could extend that window somewhat by simply obliterating the systemic lytic activity that you generate with plasminogen activators.**

The second issue is as the occlusion remains in the brain you also now are increasing the risk of bleeding, and you obviously are minimizing the potential for benefit. **And so the speed of Alfimeprase is both potentially an advance on the safety side as well as the efficacy side.** So I think right now it is hard to be clear but I think we are looking at trying to get somewhere out into the range of nine hours or so. [Emphasis added.]

24.    On January 23, 2006, Nuvelo issued a press release entitled "Nuvelo Receives

FDA Fast Track Status for Alfimeprase." Therein, the Company, in relevant part, stated:

**Nuvelo Inc. (Nasdaq: NUVO) today announced that it has been granted fast track designation by the U.S. Food and Drug Administration (FDA) for its lead product candidate, alfimeprase, for the treatment of acute peripheral arterial occlusion (PAO), or "leg attack." Fast track designation, which was mandated by the FDA Modernization Act of 1997, can potentially facilitate development and expedited review of**

Biologics License Applications (BLA). Fast track designation is reserved for new drugs that demonstrate the potential to address an unmet medical need and are intended for the treatment of a serious or life-threatening condition.

Alfimeprase is currently being studied in Phase 3 clinical trials for the potential treatment of acute PAO and catheter occlusion (CO), and may have utility in a wide range of additional thrombotic-related conditions such as stroke, deep venous thrombosis (DVT) and myocardial infarction. Collectively, these disorders are among the most common causes of death and morbidity in the Western world.

"We recently received a special protocol assessment agreement for NAPA-3, our second pivotal Phase 3 trial in acute PAO. Fast track designation represents a further step in the achievement of our regulatory strategy for alfimeprase," said Ted W. Love, M.D., chairman and chief executive officer of Nuvelo. "With a more defined regulatory path, a Phase 3 program continuing to progress and a strong global commercialization partner in Bayer HealthCare AG, we believe we are progressing toward our goal of bringing this therapy to individuals suffering from clot related disorders."

### Alfimeprase in Clinical Trials

Alfimeprase is being studied in an ongoing Phase 3 program known as the NAPA (Novel Arterial Perfusion with alfimeprase) program, for the treatment of acute PAO. The program consists of two overlapping randomized, double-blind, multi-national trials comparing 0.3 mg/kg of alfimeprase versus placebo in a total of 600 patients. The primary endpoint in both trials is avoidance of open vascular surgery within 30 days of treatment. Open vascular surgery includes procedures such as surgical embolectomy, peripheral arterial bypass graft surgery and amputation, but does not include catheter-based procedures such as percutaneous angioplasty or stenting. A variety of secondary endpoints are also being evaluated, including safety endpoints such as the incidence of bleeding, and pharmacoeconomic endpoints such as length of hospital and intensive care unit (ICU) stay. The first trial in this program, NAPA-2, is expected to complete enrollment in the second half of 2006 and the second trial, NAPA-3, is expected to begin enrollment in early 2006.

Alfimeprase is also being studied in an ongoing Phase 3 clinical program known as the SONOMA (Speedy Opening of Non-

functional and Occluded catheters with Mini-dose alfimeprase) program, for the treatment of CO. The program consists of two overlapping, multi-national trials. The first trial, SONOMA-2 is an efficacy study comparing 3 mg of alfimeprase versus placebo in 300 patients with occluded central venous catheters, evaluating restoration of function to the catheters at 15 minutes. SONOMA-2 is expected to complete enrollment in the second half of 2006. The second trial, SONOMA-3, will be an open label, single-arm trial evaluating alfimeprase alone in 800 patients. This study's primary endpoint is safety; however efficacy will also be evaluated. SONOMA-3 is expected to begin enrollment in the first half of 2006. [Emphasis added.]

25.    On February 27, 2006, Nuvelo issued a press release entitled "Nuvelo and Bayer HealthCare Begin SONOMA-3, Second Phase 3 Trial of Alfimeprase in Patients With Central Venous Catheter Occlusion." Therein, the Company, in relevant part, stated:

Nuvelo Inc. (Nasdaq: NUVO) and Bayer HealthCare (BHC) today announced that they have begun patient enrollment in a second pivotal Phase 3 clinical trial of lead product candidate, alfimeprase, for the treatment of central venous catheter occlusion (CO).

**The Phase 3 trial, known as SONOMA-3** (Speedy Opening of Non-functional and Occluded catheters with Mini-dose Alfimeprase-3), is the second of two overlapping, multi-national trials in the Phase 3 alfimeprase program for CO. This open-label, single-arm trial **will evaluate the safety and efficacy of 3 mg of alfimeprase in 800 patients with occluded central venous catheters.**

**"We believe that alfimeprase has the potential to quickly dissolve clots and rapidly restore the ability to infuse critical therapy such as chemotherapy or antibiotics through once occluded catheters," said Steven R. Deitcher, M.D., vice president of medical sciences for Nuvelo and former principal investigator of the Phase 2 trial. "We look forward to completing the first trial in this program, SONOMA-2, later this year and expect the Phase 3 trial results to confirm the ability of alfimeprase to restore function to occluded catheters in 15 minutes or less, as demonstrated in our Phase 2 trial."**

**Previously announced results from a Phase 2 multi-center, randomized, double-blind study in 55 patients with occluded**

15

**central venous catheters demonstrated that alfimeprase restored flow to 40 percent and 50 percent of occluded catheters 5 and 15 minutes after the first dose, respectively. By comparison, Cathflo(R)Activase(R) (alteplase) did not restore flow at either time point. Alfimeprase also restored flow to 60 percent of occluded catheters at 120 minutes after the first dose and to 80 percent of occluded catheters at 120 minutes after the second dose compared with 46 percent at 120 minutes after the first dose and 62 percent at 120 minutes after the second dose with Cathflo(R)Activase(R).** [Emphasis added.]

26.     Also on February 27, 2006, Nuvelo issued a second press release entitled "Nuvelo Reports 2005 Fourth Quarter and Year End Results and Accomplishments and Provides 2006 Outlook." Therein, the Company, in relevant part, stated:

> Nuvelo, Inc. (Nasdaq: NUVO) today announced 2005 fourth quarter and year end financial results and accomplishments and provided an outlook for 2006.
>
> For the fourth quarter ended December 31, 2005, Nuvelo reported a net loss of $20.9 million or $0.49 per share compared to a net loss of $13.0 million or $0.40 per share for the same period in 2004. The loss from continuing operations during the fourth quarter was also $20.9 million or $0.49 per share in 2005, compared to $10.8 million or $0.33 per share in 2004. Revenues for the fourth quarter of 2005 were $183,000, compared to revenues of $43,000 for the same period in 2004.
>
> For the year ended December 31, 2005, Nuvelo reported a net loss of $71.1 million or $1.72 per share, compared to a net loss of $52.5 million or $1.70 per share in 2004. The loss from continuing operations was also $71.1 million or $1.72 per share in 2005, compared to $48.9 million or $1.59 per share in 2004. Revenues for the year ended December 31, 2005 were $545,000, compared to revenues of $195,000 in 2004.
>
> **The increase in loss from continuing operations of $10.1 million and $22.2 million for the quarter and year ended December 31, 2005, respectively, was primarily due to increases in development expenses related to clinical trials, including outside services and the use of previously manufactured alfimeprase drug product, increased personnel costs in support of these activities, and higher general and administrative expenses incurred to build the infrastructure**

necessary to support the Company's growth and begin preparations for the planned commercial launch of alfimeprase.

As of December 31, 2005, Nuvelo had $70.3 million in cash, cash equivalents and short-term investments compared to $50.6 million at December 31, 2004. For the quarter and year ended December 31, 2005, our net cash used in operating activities was $17.2 million and $58.9 million respectively, and our "Cash Burn," a non-GAAP financial measure, (see definition and reconciliation below) was $19.4 million and $64.6 million respectively.

**In January 2006, we received a $50.0 million up-front cash payment from Bayer HealthCare upon entry into our license and collaboration agreement for alfimeprase, and in February 2006, we raised approximately $111.9 million in a public offering,** after deducting underwriters' fees and stock issuance costs of approximately $7.7 million, from the sale of 7,475,000 shares of our common stock, including 975,000 shares related to the exercise of an over-allotment option granted to the underwriters, **at a public offering price of $16.00 per share.**

Recent Corporate Accomplishments

- **Enrolled the first patient in the second Phase 3 alfimeprase trial in patients with catheter occlusion, SONOMA-3.**

- **Successfully completed a secondary offering with gross proceeds of $119.6 million, putting the Company in the strongest financial position in its history.**

- **Granted fast track status by the U.S. Food and Drug Administration (FDA) and orphan drug designation from the European Medicines Evaluation Agency (EMEA) for alfimeprase for the treatment of acute peripheral arterial occlusion (PAO).**

- **Entered into a global collaboration agreement with Bayer to optimize the worldwide development and commercialization of alfimeprase while retaining rights to alfimeprase within the United States and securing a $50.0 million up front payment, up to $335.0 million in additional potential milestone payments, 40 percent of development funding and up to 37.5 percent in tiered**

17

royalties for sales outside of the U.S.

- **Received a Special Protocol Assessment (SPA) agreement from the FDA for NAPA-3, the second pivotal Phase 3 trial evaluating alfimeprase for the treatment of acute PAO.**

- **Presented Phase 2a ANTHEM/TIMI 32 study results at the American Heart Association's Scientific Sessions 2005 showing that rNAPc2 has an acceptable safety profile and is well tolerated at the highest dose tested in patients being treated for ACS.**

**2006 Guidance and Key Milestones**

In 2006, Nuvelo expects to use cash in operating activities of between $30.0 million and $38.0 million and to have a Cash Burn of between $33.5 and $43.5 million.

**In 2006, Nuvelo anticipates accomplishing the following:**

- **Enrollment of the first patient in the second Phase 3 alfimeprase trial in acute PAO, NAPA-3, in early 2006;**

- **Completion of patient enrollment in the first Phase 3 alfimeprase trial in acute PAO, NAPA-2, in the second half of 2006;**

- **Completion of patient enrollment in the first Phase 3 alfimeprase trial in catheter occlusion, SONOMA-2, in the second half of 2006;**

- **Initiation of a Phase 2 trial of alfimeprase in ischemic stroke in the second half of 2006;**

- **Completion of a Phase 2 rNAPc2 heparin replacement study in patients with ACS in the first half of 2006;**

- **Presentation of efficacy data from our Phase 2a rNAPc2 trial in patients with ACS at a medical meeting in the second half of 2006;**

- **Initiation of a Phase 1 study of NU206 for the treatment of cancer therapy-induced mucositis in the second half of 2006.** [Internal citations omitted, Emphasis added.]

18

27.     Commenting on the Company's results, Defendant Love stated:

**2005 was a foundation building year for Nuvelo. We executed
plans to achieve all of our key strategies and goals. We
launched our initial Phase 3 programs for alfimeprase,
enhanced the Company's financial strength and obtained a
strong international partner willing to commit its significant
capabilities and resources to the successful development and
commercialization of our lead compound.... Already in 2006
we are making significant progress building on this solid
foundation, and it should be a transformational year for us as
we prepare to complete the first of our Phase 3 trials with
alfimeprase and expand the program into stroke. In addition,
we expect to generate proof-of-concept data from our Phase 2
rNAPc2 trial in acute coronary syndrome (A CS) and expand
the program into cancer. [Emphasis added.]**

28.     On April 10 2006, Nuvelo issued a press release entitled "Nuvelo and Bayer

Healthcare Begin NAPA-3, Second Pivotal Phase 3 Trial of Alfimeprase for Acute Peripheral

Arterial Occlusion." Therein, the Company, in relevant part, stated:

Nuvelo Inc. (Nasdaq: NUVO) and Bayer HealthCare (BHC)
today announced that they have begun patient enrollment in a
second pivotal Phase 3 clinical trial of alfimeprase for the
treatment of acute peripheral arterial occlusion (PAO), or "leg
attack." This Phase 3 trial, known as NAPA-3 (Novel Arterial
Perfusion with Alfimeprase-3), recently received a Special
Protocol Assessment (SPA) agreement from the U.S. Food and
Drug Administration (FDA).

NAPA-3 is the second of two overlapping multi-national trials in
the Phase 3 alfimeprase program for acute PAO. Both trials are
randomized, double-blind studies comparing 0.3 mg/kg of
alfimeprase with placebo in a total of 600 patients between the two
studies. **The primary endpoint in both trials is avoidance of
open vascular surgery within 30 days of treatment.** Open
vascular surgery includes procedures such as surgical
embolectomy, peripheral arterial bypass graft surgery and
amputation, but does not include catheter-based procedures such as
percutaneous angioplasty or stenting. **A variety of secondary
endpoints are also being evaluated in the two trials, including
safety endpoints, such as the incidence of bleeding, and
pharmacoeconomic endpoints, such as length of hospital and**

19

intensive care unit (ICU) stay.

"We recently announced that we have received fast track designation from the FDA for the NAPA program and that we expect to complete enrollment in the first trial in this program, NAPA-2, in the second half of this year," said Michael D. Levy, M.D., senior vice president of research and development for Nuvelo. "Now that we have initiated NAPA-3 and have plans to initiate additional trials in stroke and deep venous thrombosis (DVT), we are well on our way to bringing this potentially transformational therapy to the millions of patients suffering from clot related disorders."

Previously announced results from the NAPA-1 trial, a Phase 2 dose-escalation study, demonstrated that alfimeprase can restore arterial blood flow within four hours of initiation of dosing, has a favorable safety profile with minimal bleeding complications, and resulted in a majority of patients avoiding open vascular surgery within 30 days of treatment. [Emphasis added.]

29.     On May 5, 2006, Nuvelo issued a press release entitled "Nuvelo Reports First Quarter 2006 Financial Results and Accomplishments." Therein, the Company, in relevant part, stated:

Nuvelo, Inc. (Nasdaq: NUVO) today announced first quarter 2006 financial results and accomplishments.

For the three months ended March 31, 2006, Nuvelo reported a net loss of $19.7 million or $0.40 per share compared to a net loss of $14.7 million or $0.39 per share for the same period in 2005.

Revenues for the first quarter of 2006 were $1.1 million, compared to revenues of $42,000 for the same period in 2005. The increase was primarily due to the recognition of $0.8 million of revenue from the up-front license fee of $50.0 million received from Bayer HealthCare AG (Bayer) in January 2006. The up-front license fee was recorded as deferred revenue upon receipt and is being recognized on a straight-line basis over the term of the agreement, estimated to be through September 2020, when the last significant alfimeprase-related patent expires. Any other amounts billable to Bayer for milestones achieved or for sales of alfimeprase to Bayer for use in their country-specific trials or commercial sale outside of the United States will be recognized on a similar basis. Once the

development of alfimeprase has been substantially completed, any remaining deferred revenue will be recognized at that point, and any milestones and sales of alfimeprase that are billable to Bayer after that point will be recognized as earned. We are continuing to evaluate the appropriate revenue recognition for royalty payments we anticipate receiving in future years.

**The increase in net loss of $5.0 million was primarily due to an increase in general and administrative expenses of $6.4 million, including $1.8 million of non-cash stock-based compensation expense related to the implementation of SFAS 123(R), a non-cash charge of $2.9 million for the quarterly revaluation of the Kingsbridge Capital Limited warrant issued in connection with our Committed Equity Financing Facility, and other expenses primarily related to the growth in our infrastructure and pre-commercialization activities for alfimeprase. The increase in research and development expenses was primarily due to increased clinical trial and drug manufacturing activity and related personnel costs, including $1.3 million of stock-based compensation expense under SFAS 123(R). These increases were largely offset by a $5.9 million increase in amounts billable to our collaboration partners under cost-sharing arrangements, primarily with Bayer. We expect to receive Bayer's reimbursement for 40 percent of our first quarter's alfimeprase-related global development spending in the second quarter.**

**As of March 31, 2006, Nuvelo had $200.3 million in cash, cash equivalents and short-term investments compared to $70.3 million at December 31, 2005. The amount as of March 31, 2006 includes the $50.0 million up-front cash payment received from Bayer in January 2006** and $112.0 million from our public offering in February 2006, after deducting underwriters' fees and stock issuance costs of $7.6 million, in which we sold 7,475,000 shares of our common stock at a public offering price of $16.00 per share.

For the quarter ended March 31, 2006, our net cash provided by operating activities was $18.1 million, which includes the $50.0 million up-front license fee payment received from Bayer. With the $50.0 million receipt included, our Cash Burn, a non-GAAP financial measure (see definition and reconciliation below), was a $17.9 million increase in cash. Excluding the effect of this receipt, our "Cash Burn" would have been a $32.1 million decrease in cash. Key drivers behind our spending in the quarter were the ramp up of our clinical development operations for our alfimeprase Phase 3 programs in acute peripheral arterial occlusion (PAO) and catheter occlusion (CO). Additionally, we continue to incur costs associated

with our ongoing programs with rNAPc2, NU206 and our thrombin inhibiting aptamer program, and we also paid $3.7 million towards the remaining deferred rent obligation under the lease for our facility in Sunnyvale, California.

**Recent Corporate Accomplishments**

- **Entered into a global collaboration agreement with Bayer for the worldwide development and commercialization of alfimeprase while retaining rights to alfimeprase within the United States and securing a $50 million up-front payment, up to $335 million in additional potential milestone payments, 40 percent of development funding and up to 37.5 percent in tiered royalties for sales outside of the United States;**

- **Successfully completed a secondary offering with net proceeds of $112 million;**

- **Initiated the second Phase 3 alfimeprase trial in patients with acute PAO, NAPA-3;**

- **Initiated the second Phase 3 alfimeprase trial in patients with CO, SONOMA-3;**

- **Granted fast track status by the U.S. Food and Drug Administration (FDA) for alfimeprase for the treatment of acute PAO;**

- Appointed Shelly Guyer vice president, business development and investor relations.

**Upcoming Milestones**

In the remainder of 2006, Nuvelo anticipates accomplishing the following:

- **Completion of the first Phase 3 alfimeprase trial in acute PAO, NAPA-2, in the second half of 2006;**

- **Completion of the first Phase 3 alfimeprase trial in catheter occlusion, SONOMA-2, in the second half of 2006;**

- **Initiation of a Phase 2 trial of alfimeprase in ischemic**

stroke in the second half of 2006;

- Completion of a Phase 2 rNAPc2 heparin replacement study in patients with acute coronary syndromes (ACS) in the second quarter of 2006;

- Presentation of efficacy data from our Phase 2a rNAPc2 trial and our Phase 2 heparin replacement trial in patients with ACS at a medical meeting in the second half of 2006;

- Initiation of a Phase 1 study of NU206, which is being developed for the treatment of cancer therapy-induced mucositis in the second half of 2006. [Emphasis added.]

30.    Commenting on these developments, Defendant Love stated:

**We are off to a great start with Bayer, and are working together on our global development programs including preparations for our planned Phase 2 trial in ischemic stroke, as well as collaborating on manufacturing efforts as we prepare for the commercial production of alfimeprase. Additionally, we finished the first quarter with $200 million in cash, putting us in a position of financial strength as we progress four Phase 3 trials of alfimeprase and prepare to initiate a Phase 2 trial in ischemic stroke and a Phase I trial of NU206.** [Emphasis added.]

31.    Also on May 5, 2006, Defendants held a conference call to discuss the recent

developments with regard to alfimeprase. On the call, Defendants stated:

**DR. TED W. LOVE, CHAIRMAN & CEO, NUVELO, INC.: ... Last month, we initiated the NAPA-3 trial with alfimeprase, the second of two Phase 3 trails in our acute peripheral arterial occlusion. or PAO program. We also initiated SONOMA-3 trail last quarter, the second Phase 3 catheter occlusion trial. With the start of these two trails, we now have four trails Phase 3 trial ongoing with alfimeprase.** In February, we successfully completed a secondary offering, with gross proceeds of approximately $120 million. On the regulatory front, alfimeprase was granted fast track status by the U.S. Food and Drug Administration. And finally, in January, Nuvelo and Bayer HealthCare entered into a global collaboration agreement to develop and commercialize alfimeprase. With this agreement, Nuvelo retained full U.S. commercialization rights and received a

$50 million upfront payment from Bayer.

GARY TITUS, ACTING CFO & CHIEF ACCOUNTING OFFICER, NUVELO, INC.: Thanks, Ted. Hello, everyone. The first quarter has been exciting financially for Nuvelo. As Ted mentioned, we completed a successful public offering in February and executed a collaboration agreement with Bayer. These accomplishments have been instrumental in achieving our goal of building financial strength. Let me begin by reviewing our cash balance, run rate, recent collaboration and financing events. We began the first quarter with approximately $7 million and ended the quarter was approximately $200 million in cash and investment balances.

\* \* \*

**DR. MICHAEL LEVY, SVP OF R&D, NUVELO, INC.: Thank you, Gary. Over the next few minutes, I'll provide you with an update of our development pipeline, Focusing on our acute cardiovascular programs and emerging oncology programs, as well as share with your our excitement about the progress we've made. Let's begin with an update on alfimeprase, our lead cardiovascular product candidate. We started the first quarter of 2006 with the announcement of our global collaboration agreement with Bayer in January. The companies entered into this partnership with a shared vision of alfimeprase's potential to change the treatment paradigm for a wide range of conditions due to thrombosis, including acute peripheral arterial occlusion, or PAO, catheter occlusion, stroke and deep veinous thrombosis. We are well on our way to achieving this vision and are off to a great start our new partner.**

**The [UN] committees are meeting regularly, and we're actively working with Bayer on our new global development programs, including preparing for the Phase 2 stroke trial, as well as collaborating on them with our manufacturing efforts as we prepare for the commercial production of alfimeprase. In addition, we've transitioned responsibility to Bayer for managing activities relating to the [EAA] and other foreign regulatory agencies after having received confirmation from the [EAA] that our Phase 3 program in acute PAO is appropriate for drug registration in Europe. On the clinical front, with the initiation of NAPA-3, we now have four Phase 3 alfimeprase trials ongoing and are on track to complete the first of these trials, NAPA-2 and SONOMA-2, in the second half of this year. As Ted mentioned, NAPA-3, which started this April, is the second of two Phase 3 trials in our acute**

**PAO program for alfimeprase.**

Under our Special Protocol Assessment, or SPA, with the FDA, NAPA-3 will essentially replicate the NAP-2 trial, and is also a randomized double blind study containing 0.3 milligrams per kilogram of alfimeprase with placebo. It will enroll 300 patients with the primary end point gain of [INAUDIBLE] open vascular surgery within thirty days of treatment. The NAPA program, which as a whole enrolled 600 patients, received fast track designation from the FDA in 2006. Fast track is designed to facilitate drug development and can lead to a priority review of a biologic license application, or BLA, which according to the FDA may reduce the total review time from the standard 12 months to 6 months.

In addition, under the fast track program, the FDA is committed to working more closely with a sponsor, and the BLA can be submitted as a rolling submission, which allows certain sections of the BLA to be submitted and reviewed while other sections are being finalized. We continue to be on track to complete enrollment in NAPA-2, the first Phase 3 trial in this program, in the second half of 2006. Typically, the time required to lock the data base, analyze the data and then provide top line results is a few months. And subsequently, we expect that one of our investigators would present a more complete analysis of the full data at an appropriate medical conference as soon as possible thereafter. Our second target indication for alfimeprase, catheter occlusion, is also progressing well.

We achieved our milestone of initiating the second Phase 3 catheter occlusion trial, SONOMA-3, in the first half of 2006. This open label single arm trial will evaluate the safety and efficacy of 3 milligrams of alfimeprase in 800 patients with occluded central unit catheters. We continue to be on track to complete Sonoma-2, the first trial in this program, in the second half of 2006; and depending on the exact timing of the completion of SONOMA-2, we expect to be able to provide top line data shortly after enrollment of the last patient, and full data to be presented at an appropriate medical conference by one of our investigators. Finally, we're working closely with the FDA and our partner Bayer on a Phase 2 of alfimeprase in stroke and remain on target to begin enrollment in the second half of 2006. In addition, a Phase 2 trial in deep venous thrombosis, or DVT, is scheduled to begin in 2007.

MARK MONANE, ANALYST, NEEDHAM & COMPANY:...

And then I have a more concrete follow-up question on alfimeprase. It seems to me that the CO program is actually moving on very successfully. And it could be a possibility CO could with lap PAO, potentially with some -- with some good results. Is the Company indifferent to which indication is [INAUDIBLE] different? It's interesting, it seems that everything might come together about the same time. How do you view the ongoing race and/or completion of these trials?

DR. MICHAEL LEVY: Hi, Mark, Michael Levy here. Thanks for the question. You're right, the CO program is progressing well, but then so is the PAO program. They're both progressing well, I'm pleased to report. And at this time, it still looks as though they'll complete around the same time. And it's very difficult to say which will complete first. With respect to Bayer and our ourselves, we view both programs as important, both goaled towards meeting an unmet medical need, and we'll progress each of them as rapidly as we can as priorities for both companies.

\* \* \*

JIM, ANALYST: Hi, guys, just got a few questions. Just first, just wondering whether you can give us any further detail on timelines for completion of enrollment in NAPA-2 and SONOMA-2, whether we should expect that in 3Q or 4Q '06?

DR. TED W. LOVE: Hi, Jim, thanks for the question. So what we've said so far is that it will definitely be the second haft of the year, and we really haven't given guidance beyond that; so those are still our expectations for both trials.

JIM: And then just focusing on PAO specifically, could you just describe what measures you've taken in that trial to make sure docs stick to protocol when it comes to deciding who gets open vascular surgery? Whether there's been some assumptions based into the trial around protocol violaters and whether there's been any [AA] surprises in the terms of the percent of docks that are sticking to protocol here?

DR. TED W. LOVE: So you asked two questions. I'll answer the statistical one first. Yes, we took a very conservative case when we prepared the trial. Obviously in an ideal world, everyone who received placebo wouldn't respond to therapy and require surgery, and the vast components of people who received alfimeprase would respond But we took a conservative case scenario and allowed for a certain percentage of patients to be deemed to respond to placebo;

and as we've discussed in past conferences in particular, the statistical power is still overwhelming for this trial, and we have 90% [INAUDIBLE], 22% difference in the ultimate rate between the two therapies, placebo and alfimeprase.

So in terms of making sure that doctors follow the guidelines, what we've done for Phase 3 is, first of all, of course, been very careful in our site selection that we have -- that we're working with the best and most appropriate sites. And we've also got the sites to agree to work with the task guidelines, which are international consensus guidelines developed by American and European Vascular Surgery Societies detailing what sort of lesions require what sort of treatment. And so far we are very pleased that physicians are following the guidelines appropriately.

* * *

**JASON ZANE, ANALYST, PRUDENTIAL EQUITY GROUP: Thanks Questions on the regulatory front alfimeprase PAO managed. I know you are going to complete the trial completion phase second half and hopefully [INAUDIBLE], since we don't have a very long follow I think the data should be pretty soon after patients are getting through the trial. But you are still going to do the second phase three although you have the fast track, what's your thinking right now? Do you need to have two trials definitely to get a drug approved, or is there any some alternative path that you are thinking or what's the balance between you and the FDA?**

**GARY TITUS: Thanks for the question. We get asked that question a lot. And we believe that the prudent case to plan for is two trials for approval. That's typically what's required by the FDA. And really the driver here is not the statistical power for approving efficacy, because we believe that can be done with a relatively small patient sample; but we need to generate a reasonable size patient safety database to seek approval. So that's certainly the way we're planning.**

JASON ZANE: So, in other words, you are really trying to finish the trials and then -

GARY TITUS: That's our best thinking, yes.

* * *

**GARY TITUS: So, I mean, the thing to remember with alfimeprase is that it is an acute thrombolaic. But sometimes**

upon treatment of an acute problem you can highlight and discover underlying peripheral vascular disease above an beyond what was seen, and that's because from a treatment stand alfimeprase can act as a diagnostic agent by clearing away the key problems that are masking underlying issues. And so in those cases, patients may still sometimes require surgery even though the acute clot is removed.

**JASON ZANE: Right.**

**GARY TITUS:** Now, on the other hand with placebo patients, sometimes for whatever reason, you know, before surgery is performed, the surgeon or the family may decide that the patient because of, for example, other medical conditions, is a poor surgical risk and avoid surgery and take a wait and see attitude, even though there is an underlying issue, just because of the risks of surgery. Those are the sort of things that can make our results deviate from an ideal world. But as I've mentioned, even taking those issues into account, we believe we still have overwhelming statistical power to detect the difference between and active therapy such as alfimeprase -- which is indeed very active based on our Phase 2 studies to date -- and placebo. [Emphasis added.]

32.     On July 6, 2006, Nuvelo issued a press release entitled "Nuvelo Announces

Publication of Phase 2 Alfimeprase Study Results in Central Venous Catheter Occlusion."

Therein, the Company, in relevant part, stated:

> Nuvelo, Inc. (Nasdaq: NUVO) today announced the publication of Phase 2 clinical trial results in the July 1st issue of the Journal of Clinical Oncology (JCO), demonstrating that alfimeprase can quickly restore function to occluded central venous access devices (CVADs).
>
> **This Phase 2 randomized, double-blind, controlled, dose-ranging study compared the safety and activity of three fixed doses of alfimeprase (0.3 mg, 1 mg and 3 mg) against the approved dose of Cathflo(R)Activase(R) (alteplase). Fifty-five patients were treated to re-establish patency to their occluded CVADs. Catheter patency was assessed at 5, 15, 30 and 120 minutes after drug was given. If patency was not achieved at 120 minutes after the first dose of either alfimeprase or CathfloActivase, patients received a second dose. Adverse events, including bleeding events, were assessed for a 30-day**

period after exposure to study drug. The results demonstrated that at the highest dose of 3 mg, alfimeprase produced cumulative patency rates of 40% at 5 minutes, 50% at 15 minutes and 60% at 30 and 120 minutes after the first dose, as well as 80% at 120 minutes after the second dose. By comparison, CathfloActivase produced patency rates of 0% at 5 and 15 minutes, 23% at 30 minutes and 46% at 120 minutes after the first dose, as well as 62% at 120 minutes after the second dose. No major hemorrhagic events were reported in any treated patients.

"Restoration of CVAD function within minutes is important because it may facilitate timely delivery of prescribed therapies or enable early identification of CVAD obstructions that require prompt catheter replacement," said Steven R. Deitcher, M.D., vice president, medical sciences for Nuvelo and former principal investigator (PI) for the trial. "The ability to rapidly restore catheter function also may reduce patient anxiety related to missed or delayed treatment and improve treatment center efficiency."

**"Based on these promising Phase 2 results, we have initiated two overlapping, multi-national Phase 3 trials evaluating the 3 mg dose of alfimeprase in catheter occlusion. We anticipate data from the first of these trials, the SONOMA-2 trial, in the second half of this year, and hope to confirm the ability of alfimeprase to restore function to occluded catheters in 15 minutes or less," said Ted W. Love, M.D., chairman and CEO of Nuvelo.** [Emphasis added.]

33.   On August 3, 2006, Nuvelo issued a press release entitled "Nuvelo Reports Second Quarter 2006 Financial Results and Accomplishments." Therein, the Company, in relevant part, stated:

Nuvelo, Inc. (Nasdaq: NUVO) today announced second quarter 2006 financial results and accomplishments.

For the second quarter ended June 30, 2006, Nuvelo reported a net loss of $18.9 million, or $0.36 per share, compared to a net loss of $17.0 million, or $0.40 per share, for the same period in 2005. As of June 30, 2006, the company had cash, cash equivalents and short-term investments of $179.6 million.

Revenues for the second quarter of 2006 were $1.0 million

29

compared to second quarter 2005 revenues of $0.2 million. The increase was primarily due to the recognition of revenue from the up-front license fee of $50.0 million received from Bayer HealthCare (Bayer) in January 2006. The up-front license fee was recorded as deferred revenue upon receipt and is being recognized as revenue on a straight-line basis over the term of the agreement.

**Total second quarter 2006 operating expenses were $22.0 million compared to $17.6 million in the prior year period. Research and development expenses were $14.7 million for the three months ended June 30, 2006 compared to $14.5 million for the second quarter of 2005. These amounts are net of credits for cost-sharing amounts billable to collaboration partners of $8.2 million and $1.2 million in the respective periods. Increases in research and development expenses due to clinical trial, drug manufacturing and personnel costs, including $1.3 million of non-cash employee stock-based compensation expense under SFAS 123(R), were largely offset by the collaboration cost-sharing credits and a $5.0 million decrease in milestone payment expense. General and administrative expenses were $7.3 million for the three months ended June 30, 2006 and $3.2 million for the same period in 2005. The increase was primarily due to expenses related to the growth in our infrastructure, pre-commercialization activities for alfimeprase and non-cash employee stock-based compensation expense of $2.3 million.**

\* \* \*

For the three months ended June 30, 2006, our net cash used in operating activities was $16.1 million. Cash provided by operating activities was $1.9 million in the six-month period. Our cash burn, a non-GAAP measure, as defined and reconciled below, was $20.6 million and $2.9 million in the three and six months ended June 30, 2006, respectively, both including a $5.4 million cash payment in May 2006 to settle a five-year promissory note that was issued to Affymetrix in November 2001, consisting of $4.0 million of principal and $1.4 million of accrued interest. Cash burn in the six-month period includes the receipt of the $50.0 million up-front payment from Bayer in the first quarter of 2006. Due to the $5.4 million cash payment to settle the Affymetrix note and the $4.0 million up-front license fee to be paid as a result of our entry into an expanded collaboration agreement with Archemix, we are updating our guidance, and expect to use cash in operating activities in the range of $38.0 million to $46.0 million and cash burn to be in the range of $43.0 million to $53.0 million for the full year 2006.