\* \* \*

**Recent Corporate Accomplishments**

- **Initiated the second Phase 3 alfimeprase trial in acute peripheral arterial occlusion (PAO), NAPA-3;**

- **Published data from the Phase 2 alfimeprase study in central venous catheter occlusion in the July issue of** *the Journal of Clinical Oncology;*

- Successfully completed the Phase 2 heparin replacement trial evaluating rNAPc2 in acute coronary syndromes (ACS)·

- Signed new collaboration agreement with Archemix and designated NU172, a direct thrombin inhibitor, as a development candidate for potential use as a short-acting anticoagulant for patients undergoing acute cardiovascular procedures;

- Expanded management team with H. Ward Wolff as senior vice president, finance and chief financial officer; Jill M. Pergande as vice president, human resources; Gregory S. Yedinak as vice president, manufacturing and process sciences; and Ralph J. Zitnik, M.D., as vice president, development;

- Appointed James R. Gavin III, M.D., Ph.D. to Nuvelo's board of directors;

- Hosted our first Research and Development Day in New York.

**Upcoming Milestones**

In the remainder of 2006, Nuvelo anticipates accomplishing the following:

- **Completion of the first Phase 3 alfimeprase trial in acute PAO, NAPA-2;**

- **Completion of the first Phase 3 alfimeprase trial in catheter occlusion, SONOMA-2;**

- **Initiation of the Phase 2 alfimeprase trial in acute**

31

ischemic stroke, CARNEROS-1 (Catheter directed Alfimeprase for Restoration of Neurologic function and Rapid Opening of arteries in Stroke);

- Presentation of efficacy data from Phase 2a rNAPc2 trial and Phase 2 heparin replacement trial in patients with ACS at the World Congress of Cardiology, Barcelona, Spain, in September 2006;

- Initiation of a Phase 1 study of NU206, which is being developed for the treatment of cancer therapy-induced mucositis. [Emphasis added.]

34. Commenting on these results, Defendant Love stated:

**Over the past several months, we have made significant progress in the expansion of our pipeline and the execution of our milestones. In our acute cardiovascular programs, we have designated NU172, a short-acting anticoagulant, as our newest development candidate; we plan to initiate a Phase 2 trial with our most advanced candidate, alfimeprase, in stroke by year end; and we expect to complete enrollment in the first trial in each of our Phase 3 alfimeprase programs in the second half of the year. In cancer, we are preparing to initiate a Phase 1 trial with NU206, which is being developed for cancer-therapy induced mucositis, and have begun to lay the groundwork for a Phase 2 trial with rNAPc2 in colorectal cancer, based on the role that the factor VIIa/tissue factor protease complex plays in the cellular signaling of metastasis and angiogenesis in a variety of cancers. ... Finally, as we continue to build our business and prepare for commercialization, we have added several key executives to our senior management team. [Emphasis added.]**

35. Also on August 3, 2006, Defendants held a conference call to discuss the Company's recent developments with regard to alfimeprase. On the call, Defendants stated:

**TED LOVE, CHAIRMAN AND CEO, NUVELO, INC.: ... Finally, our collaboration with Bayer HealthCare to develop and commercialize alfimeprase continues to go very well, and we are tracking to our goals and milestones laid out for the program.** Bayer will highlight alfimeprase in two events this fall, a satellite symposium at the Cardiovascular and Interventional Radiological Society in Europe, known as CIRSE, held in September, and during

Bayer's international news conference, entitled Perspectives on Innovation, in Germany this October.

We are very pleased that alfimeprase will be included in these events, which emphasize the importance Bayer attributes to this program. Let me now turn the call over to Ward to discuss the specifics of our second quarter 2006 financial results.

WARD WOLFF SVP, FINANCE AND CFO, NUVELO, INC.: Thank you, Ted, and good afternoon, everyone. I am very pleased to have recently joined Nuvelo and to participate for the first time on this quarterly call. This afternoon, we released our financial results for the second quarter, ended June 30, 2006, and I will cover some of the highlights of those results.

\* \* \*

MICHAEL LEVY, SVP, R&D, NUVELO, INC.: Thank you, Ward. Over the next few minutes, I will provide you with an update of our development pipeline, focusing our acute cardiovascular and emerging oncology programs, as well as share with you our excitement about the progress we've made. Let's begin with an update on alfimeprase, our lead cardiovascular product candidate.

**On the clinical front, with the initiation of NAPA-3, we now have four phase III alfimeprase trials ongoing in our acute peripheral arterio-occlusion and cath through occlusion programs and are on track to expand the development program this year with the initiation of a phase II trial in stroke.**

NAPA-3, which started this April, is the second of two phase III trials in our acute [KO] program. Under our special protocol assessment, or SPA, with the FDA, NAPA-3 will essentially replicate the NAPA-2 trial. It too is a randomized, double-blind study, comparing 0.3 milligrams per kilogram of alfimeprase with placebo, and it too will enroll 300 patients with the primary endpoint of avoidance of open vascular surgery within 30 days of treatment.

A variety of secondary endpoints are also being evaluated, including restoration of blood flow, which is a key measure physicians use in determining success of treatment. Safety endpoints, such as the incidence of bleeding and pharmacoeconomic endpoints, such as length of hospital and ICU stay. We continue to be on track to complete enrollment in NAPA-2, the first phase III trial in this program in the second half of 2006.

Typically, the time required to lock the database, analyze the data and then provide top-line results in several months. Subsequently, we expect that one of our investigators would submit a more complete analysis of the full data at an appropriate medical conference as soon as possible thereafter.

Moving now to our second target indication, catheter occlusion. We are pleased to announce that results from our phase II trial of alfimeprase in its indication were published in the July 1st issue of the Journal of Clinical Oncology. In addition, our phase III program in this indication is progressing well. We achieved our milestone of initiating the second phase III catheter occlusion trial, SONOMA-3, in the first half of 2006. This open-label single-arm trial is evaluating the safety and efficacy of three milligrams of alfimeprase in 800 patients with occluded central venous catheters.

We also continue to be on track to complete enrollment in SONOMA-2, the first trial in this program, in the second half of 2006, and expect to provide top-line results several months afterwards. More complete analysis of the data will be presented at an appropriate medical conference as soon as possible thereafter.

At our first R&D day in June, we shared with you the progress we've made on our third target indication for alfimeprase, acute ischemic stroke. We've met with the FDA and with our partner Bayer and have agreed upon the design of our phase II trial. And in keeping with our theme of California wine regions, the alfimeprase stroke trial has been designated the CARNEROS-1 trial. This will be an open-label dose-escalation study in up to 90 patients within three to nine hours of stroke onset and will measure safety and arterial re-[catalyzation] rate.

We expect to initiate this trial the second half of this year. At our R&D day, we also had a chance to expand on the potential for alfimeprase in deep venous thrombosis for DVT. At that meeting, we highlighted that the unfavorable risk to benefit ratio for plasminogen activators has limited their use in this patient population. In contrast, the speed and safety profile we've seen today with alfimeprase in our acute PAO and catheter occlusion trials makes it a compelling candidate, potentially, to treat DVT. And we continue to be on track to initiate a phase II trial in DVT in 2007.

34

**On the manufacturing side, we are completing commercial-scale process validation and are planning to initiate commercial production runs early next year.** As Ted mentioned, Bayer will be sponsoring a satellite symposium at the CIRSE meeting in Rome, Italy, in September entitled, Advances in Thrombolytic Therapy, a Focus on Alfimeprase.

\* \* \*

TED LOVE: Thank you, Michael. As **you can see, we have a number of exciting milestones coming up, including for alfimeprase, completion of patient enrollment in both the NAPA-2 and SONOMA-2 trials and initiation of CARNEROS-1, our phase II trial in ischemic stroke, all expected to occur in the second half of 2006.**

\* \* \*

JIM BIRCHENOUGH: And just one other question, just on the type of patients that may come in to the trial with an acute occlusive event. I'm imagining that for PAO they may be a bit of a heterogeneous group with some patients that may have enlarged fixed [inaudible] occlusion already and then a minor thrombus on top of it, a direct fibrinolytic might not help that much, whereas a patient with a small fixed lesion and a large thrombus may derive more of a benefit.

Can you just talk about the heterogeneity of the patients that you expect in this trial and how you I guess avoid the risk of patients coming in with enlarged fixed lesions that you might be able to help much with a thrombolytic.

MICHAEL LEVY: So, as you suggest, the group of patients that present are heterogeneous. Almost all the patients, if not all the patients, do have some sort of underlying fixed peripheral vascular disease, and that a thrombus generally forms on top of that when flow is diminished to a critical stage. We do of course select in this trial for patients who have had an acute occlusion of less than 14 days. That's one thing we do. And obviously I have no data to share with you about this particular trial, but I **can say that we were very gratified in phase to find that alfimeprase worked very well on big clots and on small clots, and we've discussed that in the past, that we've had some examples of very large clots, clots up to 60 centimeters in length, that we've dissolved rapidly.**

**And it's worked on what we thought were new clots and old clots,** based on the angiograms that we read showing extensive collateralizations, which tend to be evidence of an older clot. And

on top of that, **in phase I, we looked at patients who had chronic peripheral vascular disease where the burden of their illness was fixed disease and very little was acute thrombus. And we were gratified that in 40% of those patients as well we could see improvements on the angiogram and restoration of blood flow.** [Emphasis added.]

36.  On September 5, 2006, Nuvelo issued a press release entitled "Nuvelo Announces Completion of Patient Enrollment in SONOMA-2, First Phase 3 Trial of Alfimeprase in Central Venous Catheter Occlusion." Therein, the Company, in relevant part, stated:

> Nuvelo, Inc. (Nasdaq: NUVO) today announced that it has completed patient enrollment in the first Phase 3 clinical trial of alfimeprase for the treatment of central venous catheter occlusion (CO).
>
> The Phase 3 trial, known as SONOMA-2 (Speedy Opening of Non-functional and Occluded catheters with Mini-dose Alfimeprase-2), is the first of two ongoing, multi-national trials in the Phase 3 alfimeprase program for CO. This randomized, double-blind trial compared the efficacy and safety of 3 mg of alfimeprase with placebo in a 2:1 ratio in approximately 300 patients with occluded central venous catheters. The study's primary endpoint is restoration of function to occluded central venous catheters at 15 minutes.
>
> "Catheter occlusion is a widespread problem which can result in delayed administration of critical therapies such as cancer chemotherapy or antibiotics, and we are optimistic that alfimeprase will more rapidly restore delivery of these life-saving medications than existing treatments," said Steven R. Deitcher, M.D., vice president and chief medical scientist for Nuvelo and former principal investigator of Nuvelo's Phase 2 alfimeprase catheter occlusion trial. "We thank the many patients, physicians, and health care workers who participated in this trial and look forward to sharing top-line data within the next several months."
>
> The second Phase 3 trial, known as SONOMA-3, was initiated in February 2006 and is ongoing. This open-label, single-arm trial will evaluate the safety and efficacy of 3 mg of alfimeprase in

800 patients with occluded central venous catheters.

37.     Also on September 5, 2006, Nuvelo issued a press release entitled "Nuvelo Announces Completion of Patient Enrollment in NAPA-2, First Phase 3 Trial of Alfimeprase in Acute Peripheral Arterial Occlusion." Therein, the Company, in relevant part, stated:

> Nuvelo, Inc. (Nasdaq: NUVO) today announced that it has completed patient enrollment in the first Phase 3 clinical trial of alfimeprase for the treatment of acute peripheral arterial occlusion (PA)), or "leg attack."
>
> The Phase 3 trial, known as NAPA-2 (Novel Arterial Perfusion with Alfimeprase-2), is the first of two multi-national trials in the Phase 3 alfimeprase program for acute PAO. This randomized, double-blind study compared the efficacy and safety of 0.3 mg/kg of alfimeprase versus placebo in approximately 300 patients in over 100 centers worldwide. The study's primary endpoint is avoidance of open vascular surgery within 30 days of treatment. Open vascular surgery includes procedures such as surgical embolectomy and peripheral arterial bypass graft surgery as well as amputation, but does not include catheter-based procedures such as percutaneous angioplasty or stenting. A variety of secondary endpoints are also being evaluated, including restoration of arterial blood flow, safety endpoints such as the incidence of bleeding and pharmacoeconomic endpoints such as length of hospital and intensive care unit (ICU) stay.
>
> **"We'd like to thank the patients, investigators, and coordinators at our trial sites for helping us to reach this important milestone," said Michael D. Levy, M.D., senior vice president, research and development for Nuvelo. "We look forward to announcing top-line data within the next several months and are hopeful that these data will confirm our Phase 2 study, which demonstrated the ability to restore arterial blood flow within four hours of initiation of dosing with a favorable safety profile."**
>
> The second Phase 3 trial, known as NAPA-3, was initiated in April 2006 and is ongoing. This trial essentially replicates the NAPA-2 study design and is being conducted under a special protocol assessment (SPA) agreement with the U.S. Food and Drug Administration (FDA).
>
> In addition, the FDA granted alfimeprase fast track designation for

37

the treatment of acute PAO, which can potentially facilitate development and expedited review of a Biologics License Application (BLA). Fast track designation is reserved for new drugs that demonstrate the potential to address an unmet medical need and are intended for the treatment of a serious or life-threatening condition. Alfimeprase also has received orphan drug designation from both the FDA and the Committee for Orphan Medicinal Products of the European Medicines Agency for the treatment of acute PAO. [Emphasis added.]

38.     On November 2, 2006, Nuvelo issued a press release entitled "Nuvelo Reports Third Quarter 2006 Financial Results and Accomplishments." Therein, the Company, in relevant part, stated:

Nuvelo, Inc. (Nasdaq: NUVO) today announced third quarter 2006 financial results and accomplishments.

For the third quarter ended September 30, 2006, Nuvelo reported a net loss of $26.7 million, or $0.51 per share, compared to a net loss of $18.5 million, or $0.44 per share, for the same period in 2005. As of September 30, 2006, the company had cash, cash equivalents and short-term investments of $157.2 million.

Revenues for the third quarter of 2006 were $0.9 million compared to third quarter 2005 revenues of $0.1 million. The increase was primarily due to the recognition of revenue from the up-front license fee of $50.0 million received from Bayer HealthCare (Bayer) in January 2006. The up-front license fee was recorded as deferred revenue upon receipt and is being recognized as revenue on a straight-line basis over the term of the agreement.

Total third quarter 2006 operating expenses were $29.7 million compared to $19.0 million in the prior year period. Research and development expenses were $23.1 million for the three months ended September 30, 2006 compared to $14.8 million for the third quarter of 2005. These amounts are net of credits for cost-sharing amounts billable to collaboration partners of $7.9 million and $0.5 million in the respective periods. Research and development expenses increased primarily due to clinical trial and drug manufacturing activities, a $4.0 million up-front license fee paid as a result of our entry into an expanded collaboration agreement with Archemix, and personnel costs, including $1.1 million of non-cash employee stock-based compensation expense

under SFAS 123(R), which were partially offset by the increase in cost-sharing credits noted above. General and administrative expenses were $6.8 million for the three months ended September 30, 2006 and $4.2 million for the same period in 2005. The increase was primarily due to expenses related to the growth in our infrastructure, pre-commercialization activities for alfimeprase and non-cash employee stock-based compensation expense of $1.3 million.

\* \* \*

For the three and nine months ended September 30, 2006, our net cash used in operating activities was $24.0 million and $22.1 million, respectively. Our cash burn, a non-GAAP measure, as defined and reconciled below, was $22.5 million and $25.3 million in the three and nine months ended September 30, 2006, respectively, both including the $4.0 million up-front license fee paid to Archemix. Additionally, cash burn in the nine-month period includes the receipt of the $50.0 million up-front payment from Bayer in the first quarter and the $5.4 million cash payment in the second quarter to settle the principal and interest on a promissory note issued to Affymetrix.

\* \* \*

**Recent Corporate Accomplishments**

- **Completed enrollment in the first Phase 3 alfimeprase trial in acute PAO, NAPA-2;**

- **Completed enrollment in the first Phase 3 alfimeprase trial in CO, SONOMA-2;**

- Presented Phase 2 efficacy data from the ANTHEM (Anticoagulation with rNAPc2 To Help Eliminate MACE)/TIMI 32 trial evaluating rNAPc2 in patients with acute coronary syndromes (ACS) at the World Congress of Cardiology in Barcelona and at the Transcatheter Cardiovascular Therapeutics 2006 Conference in Washington, D.C.;

- Signed a new collaboration agreement with Archemix and designated NU172, a short-acting, direct thrombin inhibiting aptamer, as a development candidate for potential use as an anticoagulant for patients undergoing acute medical or surgical procedures;

- Expanded management team with Ward Wolff as senior vice president, finance and chief financial officer, and Jill Pergande as vice president, human resources.

**Upcoming Milestones**

In the remainder of 2006 and into early 2007, Nuvelo anticipates accomplishing the following:

- **Presentation of Phase 2 alfimeprase and rNAPc2 data at the American Heart Association Scientific Sessions 2006 in November;**

- **Release of top-line data from both the NAPA-2 and SONOMA-2 trials;**

- **Initiation of a Phase 2 alfimeprase trial in acute ischemic stroke, CARNEROS-1 (Catheter directed Alfimeprase for Restoration of Neurologic function and Rapid Opening of arteries in Stroke) in the fourth quarter of 2006;**

- Initiation of a Phase 1 study evaluating NU206 in the fourth quarter of 2006;

- Initiation of IND-enabling studies for NU172 in the fourth quarter of 2006. [Emphasis added.]

39.     Commenting on the recent developments, Defendant Love stated:

**In the third quarter, we achieved two significant milestones in the Company's history by completing enrollment in the first trial in both Phase 3 alfimeprase programs. We also advanced our pipeline by presenting positive results from a Phase 2 proof-of-concept trial evaluating the potential of rNAPc2 in the treatment of patients with acute coronary syndromes (ACS), nominating a new product candidate, NU172, and expanding our agreement with Archemix for the discovery of short-acting anticoagulants. Over the next several months, we will remain focused on our key value-driving deliverables - execution of our milestones, and producing and announcing top-line alfimeprase data in acute peripheral arterial occlusion (PAO) and catheter occlusion (CO). [Emphasis added.]**

40.     Also on November 2, 2006, Defendants held a conference call to discuss the

Company's recent developments with regard to alfimeprase. On the call, Defendants stated:

> DR. TED W. LOVE, MD, PRESIDENT AND CEO, NUVELO: Thank you all for joining us today. We are very pleased to share with you our third quarter financial results and accomplishments.

> \* \* \*

> **Over the past months, we've been focused on the execution of our milestones, particularly with regards to our alfimeprase Phase III programs and the development of our pipeline. Let me quickly review the most recent corporate accomplishments.**

> **In September, we were very pleased to announce the completion of patient enrollment in the first trial of each Phase III alfimeprase programs. This includes NAPA-2, which is evaluating alfimeprase for the treatment of acute peripheral arterial occlusion (or PAO), and SONOMA-2, which is evaluating alfimeprase for the treatment of catheter occlusion (or CO).**

> \* \* \*

> Let me now turn the call over to Ward to discuss the specifics of our third quarter 2006 financial results.

> WARD WOLFF, SVP FINANCE AND CFO, NUVELO: Thank you, Ted, and good afternoon, everyone. After the close of the market today, we released our financial results for the third quarter ended September 30, 2006 and I will cover some of the highlights of those results.

> \* \* \*

> To elaborate on those activities, I will turn the call over to Dr. Michael Levy, Senior Vice President of R&D.

> DR. MICHAEL LEVY, SVP, R&D, NUVELO: ... Over the next few minutes, I will provide you with an update of our development pipeline, focusing on our acute cardiovascular and emerging oncology programs, as well as share with you our excitement about the progress we've made.

> **Let's begin with an update on alfimeprase, our lead cardiovascular product candidate.**

> **As announced in September, we've completed enrollment in the**

41

first trial in both our Phase III alfimeprase programs for acute PAO and CO. These are important milestones for us. We are now working hard to collect and process the data in a high-quality, efficient manner and are on track to announce top line data from each trial before year-end or early in 2007.

In addition to the two trials we've completed, we have ongoing Phase III trials in acute PAO and CO, known as NAPA-3 and SONOMA-3, respectively. NAPA-3 started this April and the trial is designed to essentially replicate NAPA-2.

Earlier this year, we gained agreement from the FDA to transfer select high-quality sites from the NAPA-2 trial to the NAPA-3 trial upon completion of the first study and in fact, we've already begun that process.

As we did with NAPA-2, we plan to announce guidance on when we expect to complete this trial when we have more experience with the trial accrual rate.

SONOMA-3 began this February and is an open label, single arm trial evaluating the safety and efficacy of 3.0-mg of alfimeprase in 800 patients with occluded central venous catheters. As with NAPA-3, we plan to provide guidance on when we expect to complete this trial, when we have sufficient experience with the trial accrual rate.

Moving on to the potential use of alfimeprase in stroke, we remain optimistic that alfimeprase's speed of action and safety profile give us the ideal profile to study in the treatment of acute ischemic stroke. Alfimeprase may be able to rapidly restore blood flow, decrease bleeding complications and side effects, and expand the treatment window beyond the current three-hour timeframe.

We continue to make progress with our clinical plan and expect to initiate the Phase II trial, known as CARNEROS-1, in the fourth quarter of this year. This will be an open label, dose escalation study in up to 90 patients within three-to-nine hours of stroke onset and the primary end points will focus on safety as well as arterial recanalization and reperfusion rates.

Alfimeprase's speed and safety profile also make it a compelling candidate to study for the treatment of deep venous thrombosis (or DVT) and we continue to be on track to initiate a Phase II trial in DVT in 2007.

In keeping with our efforts to educate physicians about our alfimeprase clinical trial results, we continue to make presentations at relevant scientific meetings. The next such presentation will be at the American Heart Association (AHA) Scientific Sessions 2006, where we will be presenting data from the previous NAPA-1 Phase II trial of alfimeprase in acute PAO.

* * *

DR. TED W. LOVE: Thank you, Michael. Over the next several months, we will remain focused on our key value-driving deliverables, execution of our milestones, and producing and announcing top line alfimeprase results in acute PAO and CO.

For our cardiovascular pipeline, our upcoming milestones include presentations of alfimeprase and rNAPc2 at the AHA in November. This will include data from the NAPA-1 Phase II trial of alfimeprase in acute PAO and further safety and efficacy results from the Phase II ANTHEM TIMI-32 trial, evaluating rNAPc2 in patients with ACS.

Second, the release of top line data results from both the NAPA-2 and SONOMA-2 by the end of this year or early in 2007. Third, the initiation of CARNEROS-l, our Phase 2 trial evaluating alfimeprase in acute ischemic stroke, in the fourth quarter of 2006 and last, the initiation of a Phase 2 trial evaluating alfimeprase in deep venous thrombosis in 2007.

For our oncology pipeline, initiation of an NU206 Phase I study in the fourth quarter of 2006 and initiation of a Phase II program evaluating rNAPc2 in metastatic colorectal cancer in the first half of 2007.

In closing, we remain on track to successfully complete each of the milestones that we established in 2006. We look forward to updating you on our progress on our next quarterly call.

* * *

MAGED SHENOUDA, ANALYST, UBS: Sure, thanks for taking my questions. **First, just as a market question, can you help us size the DVT opportunity relative to the PAO opportunity?** And also, what are you thinking, at least at this very early stage, in terms of dosing and pricing? And then also, could you just elaborate on NU 172 a little bit?

DR. MICHAEL LEVY: Thanks for the question. Let me start off, then, with the question about the DVT opportunity. **Looking strictly in terms of the epidemiology, clearly there are a lot more DVT patients diagnosed and ready for treatment in the United States every year than there are acute PAO patients and it's difficult to estimate exactly how big the DVT opportunity is in terms of patients. It depends a bit on diagnosis.**

But the best conservative estimates indicate that something like 650,000 patients are diagnosed in the United States every year and treated and with acute PAO, it's more like 100,000 to 125,000, so a bigger unmet medical need, in terms of the patient load. And we think that translates into the size of the market opportunity as well.

As you know, typically you don't finalize decisions on pricing until after the Phase III trials are complete and you move forward with discussions with various governmental agencies around the world. And we're just not at a stage yet where we can share much information with you, with regard to pricing.

**But we think DVT is a huge opportunity for us and when you run through the math, even on the back of an envelope, you can see that you don't have to have a very large share of the market before it becomes a very big commercial opportunity indeed.**

\*\*\*

JIM BIRCHENOUGH, ANALYST, LEHMAN BROTHERS: Hi guys, just a couple of questions in looking ahead to the NAPA-2 results. **What do you think an acceptable excess bleeding rate is or is there any acceptable excess bleeding rate and in particular, when we think about intracerebral hemorrhage, is there any acceptable rate? Or should we expect to see really none with alfimeprase?**

DR. MICHAEL LEVY: Well, that's a very good question and let me tell you what we're aiming for. Obviously we're aiming to develop a compound that has the best possible profile in terms of the risk/benefit ratio in particular and what we'll do is look at the data in its totality. **So we need to look at how fast and efficacious alfimeprase is and then we need to look at the side effect profile.**

**But at this time, we're very confident and optimistic that we'll be able to show in Phase III that we have a drug that has a great risk/benefit profile and that it has the potential to be an**

44

**important new treatment.** [Emphasis added.]

41.    The statements contained in ¶¶ 22-40 were materially false and misleading when made because Defendants failed to disclose or indicate the following: (1) that the clinical trial information regarding multiple alfimeprase studies was inaccurate; (2) specifically, clinical data from testing failed to show that alfimeprase, when administered through a catheter, could dissolve blood clots; (3) that no reliable data existed to show that alfimeprase would meet the high standards for efficacy for FDA approval; (4) that such information, as described above, was known to Defendants as early as December 2004, when Amgen discontinued its investment in alfimeprase; and (5) that, as a result of the above, the Company's statements concerning alfimeprase and its clinical trials were lacking in any reasonable basis when made.

## The Truth Begins to Emerge

42.    On December 11, 2006, Nuvelo shocked investors by issuing a press release entitled "Nuvelo and Bayer Healthcare Announce Phase 3 Trials of Alfimeprase in Patients with Acute Peripheral Arterial Occlusion and Catheter Occlusion Did Not Meet Primary Endpoints." Therein, the Company, in relevant part, revealed:

> Nuvelo, Inc. (Nasdaq: NUVO) and Bayer HealthCare today **announced top-line data demonstrating that the Phase 3 clinical trial of alfimeprase in acute peripheral arterial occlusion (PAO), known as NAPA-2 (Novel Arterial Perfusion with Alfimeprase-2), did not meet its primary endpoint of avoidance of open vascular surgery within 30 days of treatment. The companies also announced that the Phase 3 trial in catheter occlusion (CO), known as SONOMA-2 (Speedy Opening of Non-functional and Occluded catheters with Mini-dose Alfimeprase-2), did not meet the endpoint of restoration of function at 15 minutes. These trials did not meet key secondary endpoints. In addition, the companies**

45

announced that they have temporarily suspended enrollment
in the ongoing Phase 3 trials, NAPA-3 and SONOMA-3, until
further analyses and discussions with outside experts and regulatory
agencies are completed. [Emphasis added.]

43.     Commenting on the revelation, Defendant Love stated:

These outcomes are disappointing particularly for patients with
acute PAO, who have few treatment options. ... We and our
partner Bayer will conduct further analyses and have discussions
with the Data Safety and Monitoring Board members, outside
experts and regulatory authorities to determine how to proceed
with the development of alfimeprase, including the possibility of
alternative dosing and delivery."

44.     During the December 11, 2006 conference call to discuss the Company's

recent shocking revelations with regard to alfimeprase, Defendant Love stated:

DR. TED W. LOVE, CHAIRMAN AND CEO, NUVELO: Thanks
to all of you for joining us today. Here with me today are members
of the Nuvelo senior management team. As you are now aware,
we and Bayer announced top-line data demonstrating that the
Phase III clinical trial of alfimeprase in acute peripheral
arterial occlusion, RPAO, known as NAPA-2, did not meet its
primary endpoint of avoidance of open vascular surgery at 30
days of treatment.

In addition, the Phase III trial in catheter occlusion, or CO,
known as SONOMA-2, did not meet the endpoint of restoration
of function at 15 minutes. We have also temporarily suspended
enrollment in the ongoing Phase III trials NAPA-3 and
SONOMA-3 until further analysis and discussion with outside
experts and regulatory agencies are completed.

To be clear, we are not ending either of the ongoing trials at
this time. We were obviously disappointed in the outcomes of
the NAPA-2 and SONOMA-2 trials particularly for the patients
with acute PAO who have few treatment options. The NAPA-2
trial also did not meet its secondary efficacy and safety
endpoints.

We are confident that the NAPA-2 study compliance and conduct
were excellent. One of the key observations from the trial suggest

46

the possibility that a significant number of patients mechanical manipulation resulted in disruption of the clot allowing runoff of alfimeprase beyond the clot with an activation by alpha-2 macroglobulin. This may have negatively impacted the alfimeprase ARM.

While the data from the SONOMA-2 trial show a statistically significant difference in the rate at which alfimeprase and placebo dissolved clots in venous catheters at 15 minutes, this result did not meet the high threshold established by the FDA for regulatory approval based on only one control trial. We and our partner Bayer will conduct further analysis and have discussions with the data safety monitoring board members, outside experts, and regulatory authorities to determine how to proceed with the development of alfimeprase in these indications including the possibility of alternative dosing and delivery.

JIM BIRCHENOUGH, ANALYST, LEHMAN BROTHERS: Hi, Ted. Just **I guess the first question is whether there was any evidence of thrombolytic effect of alfimeprase in either NAPA-2 or SONOMA-2 and what that evidence of thrombolytic effect was? I'm somewhat baffled based on the prior Phase II results that we wouldn't have seen any thrombolytic effect here. I'm just wondering whether you can characterize any positives that you saw in the trial results?**

DR. TED W. LOVE: Hi, Jim. I'd be happy to try to do that. **We don't want to get into too many of the details until we obviously have a DSMB go through all of this. But to get to your point, we definitely did see thrombolytic effect.** We saw it at what would traditionally be considered a statistically significant rate in the SONOMA trial. But we had an agreement with the FDA that the P-value would be far lower than .05 which would be the traditional number. We were below that number. So we did see thrombolytic effect in catheter occlusion.

**In PAO, we actually saw a very profound effect of placebo. And in fact I think the best we can guess at this point is that the mechanical disruption of the clot facilitated a very high rate of clot dissolution and clot resolution. And it may have also facilitated very rapid washout of alfimeprase really allowing it not to demonstrate any particular advantage over the placebo.**

**JIM BIRCHENOUGH: So based on that assessment, could you comment on where you stand for pursuing alfimeprase in**

47

stroke and DVT, whether we should expect continued development in those areas?

**DR. TED W. LOVE:** I think what we want to do at this point is complete the analysis of all the data that we've got both efficacy and safety in making informed decisions. We obviously have suspended the enrollment in SONOMA-3 and NAPA-3 and obviously would not initiate enrollment in any other program until we've worked through all of these questions.

\* \* \*

KIM LEE, ANALYST, PACIFIC GROWTH EQUITIES: Thanks for taking the question. What is the status of initiation of the Phase II trials in stroke and DVT?

**DR. TED W. LOVE:** So as I mentioned we put the enrollment of all the trials with alfimeprase on hold. And we really want to work carefully through all the data that we've got before we move forward with any of the -- any further enrollment in NAPA-3 or SONOMA-3 or any of the other programs. So all those programs will wait for review of all the data.

\* \* \*

JIM BIRCHENOUGH: So I'm just trying to understand why that might not have happened in the Phase II experience where it seems that you had higher thrombolysis rates?

**DR. TED W. LOVE:** I think it probably did but that's the kind of stuff we need to go through. I actually think it did probably happen in Phase II. And when we were seeing it, when we were seeing high rates of opening, we expected that was all due to drug. [Emphasis added.]

45. On the release of this shocking news, shares of Nuvelo plummeted $15.50, or 79 percent, to close, on December 11, 2006, at $4.05 per share, on unusually high trading volume.

46. The market's reaction to the Company's release of this unexpected and shocking revelation may best be summed up by the views stated by the biotechnology analysts that followed Nuvelo. In their research reports released immediately following the Company's shocking news, the analysts, in relevant parts, stated:

48

- Miller Johnson Steichen Kinnard analyst Carl Byrnes:

**NAPA-2 and SONOMA-2 Trials Fail to Meet Primary and Secondary Endpoints**
**The failure of the NAPA-2 and SONOMA-2 trials is a stunning setback.** While it is possible that alternative dosing or delivery may offer some hope for future development progression of alfimeprase, **we assess these prospects as being very low at this juncture.** [Emphasis added.]

- Prudential analyst Jason Zhang, Ph.D.:

**Sometimes, when a stock is hammered badly after failure of a key clinical trial, it could be a good buying opportunity if the trial could be salvaged or if the drug is in other clinical trials that could yield positive data to support further development or approval. We believe that is not the case here. Alfimeprase is the main drug from Nuvelo's pipeline and represents more than 80% of the company's value. Without a reasonable expectation this drug would be approved for the two indications the company sought, the stock is unlikely to recover anytime soon.** [Emphasis added.]

- Wachovia analysts George Farmer, Ph.D. and Francine

Pollack, CFA:

**Following disappointing Phase III results on alfimeprase, we await additional data and guidance from management to better assess this program. We view only modest value in the remainder of the pipeline.** [Emphasis added.]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Nuvelo between January 5, 2006 and December 8, 2006, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Nuvelo's securities were actively traded on NASDAQ under the symbol "NUVO." While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nuvelo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nuvelo; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

53. The market for Nuvelo's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Nuvelo's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Nuvelo securities relying upon the integrity of the market price of Nuvelo's securities and market information relating to Nuvelo, and have been damaged thereby.

54. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Nuvelo's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

55. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of

materially false or misleading statements about Nuvelo's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Nuvelo and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

56.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

57.    During the Class Period, Plaintiff and the Class purchased securities of Nuvelo at artificially inflated prices and were damaged thereby. The price of Nuvelo securities declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

58.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Nuvelo, their control over, and/or

receipt and/or modification of Nuvelo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Nuvelo, participated in the fraudulent scheme alleged herein.

59. Additionally, during the Class Period and with the Company's stock trading at artificially inflated prices, Defendants acted with further scienter in that they knew that their false and misleading statements would continue to support an artificially inflated stock price. Based on this increased value in the stock price, Nuvelo was able to generate significantly superior amounts of capital through their financing and stock offering activities. For example, the Company was able to successfully complete a Follow-On Offering in 2006, yielding them $119 million. Additionally, the Company was able to partner with Bayer to receive an immediate capital influx of $50 million to stabilize their anemic operations, with the ability to earn hundreds of millions of dollars more contingent upon the achievement of certain milestones.

60. These false and misleading statements also enabled the Defendants to secure higher bonus payments, which were directly based upon their success in bringing alfimeprase to the commercial market.

61. Moreover, Defendant Gary Titus was able to cash in on the Company's artificially inflated stock price by selling 75,831 shares of Nuvelo for gross proceeds of $1,521,360.00. His inside trading during the class period is evidenced by the following chart:

| Date | Inside Seller | # Shares | Price | Gross proceeds |
|------|---------------|----------|-------|----------------|
| August 30, 2006 | TITUS, GARY | 14,000 | $20.70 | $289,800 |
| August 29, 2006 | TITUS, GARY | 6,831 | $20.65 | $141,060 |
| August 25, 2006 | TITUS, GARY | 40,000 | $19.88 - $20.00 | $798,000 |
| August 24, 2006 | TITUS, GARY | 15,000 | $19.50 | $292,500 |
| TOTAL SALES: | | **75,831** | | **$1,521,360** |

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

62.     At all relevant times, the market for Nuvelo securities was an efficient market for the following reasons, among others:

      a.     Nuvelo stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

      b.     As a regulated issuer, Nuvelo filed periodic public reports with the SEC and NASDAQ;

      c.     Nuvelo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.     Nuvelo was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

63.     As a result of the foregoing, the market for Nuvelo securities promptly digested current information regarding Nuvelo from all publicly-available sources and reflected such information in Nuvelo's stock price. Under these circumstances, all purchasers of Nuvelo securities during the Class Period suffered similar injury through their purchase of Nuvelo securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

64.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Nuvelo who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Nuvelo securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

67.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Nuvelo securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

68.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Nuvelo as specified herein.

69.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Nuvelo's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Nuvelo and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Nuvelo securities during the Class Period.

70.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level

executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

71.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Nuvelo's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

72.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Nuvelo

securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Nuvelo's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Nuvelo securities during the Class Period at artificially high prices and were damaged thereby.

73. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Nuvelo was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Nuvelo securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

74. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

76. Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

77.    The Individual Defendants acted as controlling persons of Nuvelo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.    As set forth above, Nuvelo and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

a.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Date: <u>March 1, 2007</u>

**BROWER PIVEN,**
**A PROFESSIONAL CORPORATION**

David A.P. Brower (DB 4923)
Elizabeth A. Schmid (ES 1294)
488 Madison Avenue, Eighth Floor
New York, New York 10022
(212) 501-9000

**BROWER PIVEN,**
**A PROFESSIONAL CORPORATION**
Charles J. Piven
Marshall N. Perkins
The World Trade Center-Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland 21202
(410) 332-0030

*Counsel for Plaintiff*

60

## PLAINTIFF'S CERTIFICATION

_Arnold Giles_ ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.    Plaintiff's transactions in Nuvelo, Inc. securities during the Class Period are as follows:

(Complete only one trade per line; place any additional trades on the attached sheet)

| # of Shares | Purchased (P) / Sold (S) | Price Per Share | Date of Purchase/Sale |
|---|---|---|---|
| 100 | Purchased | 17.10 | 3/6/2006 |
| | | | |
| | | | |

5.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court. Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26 day of _February_ 2007.

_Arnold Giles_
Signature